## Sincavage v. Philadelphia & Reading Coal and Iron Company.

*Workmen's compensation—Recovery from accident—Subsequent neurasthenia.*

An injured workman is entitled to compensation after he has so far recovered from an accident that he is physically able to work, but, because of neurasthenia which results from his accident, honestly thinks he cannot work.

Appeal by the defendant from the order of the Workmen's Compensation Board reinstating compensation agreement. C. P. Schuylkill Co., Nov. T., 1927, No. 374.

*Roger Dever*, for plaintiff; *John F. Whalen* and *Geo. Ellis*, for defendant.

KOCH, P. J., Jan. 30, 1928.—The question in this case is whether a claimant is entitled to compensation after he has so far recovered from an accident that he is physically able to work, but, because of neurasthenia, which results from his accident, honestly thinks he cannot work. This case has a long history and we shall review. it.

On May 5, 1919, while the claimant was being lowered in the shaft at the defendant's Maple Hill Colliery, the cage dropped to the bottom of the shaft and the claimant was severely injured. A compensation agreement was entered into on May 19, 1919, for the payment of $10 a week to the claimant. On June 15, 1921, the claimant petitioned for a modification of the agreement, on the alleged ground that he was totally disabled and would never be able to work, and averred that the agreement should provide for compensation for 500 weeks to enable him to petition for computation to start a small business. The defendant denied the averments in the petition and alleged that the claimant was able to do light work and that he had been directed by the attending surgeon to present himself to the employer for the purpose of learning just what kind of labor he could do. The referee found that the claimant was entitled to partial compensation because he could do some light form of work and dismissed the petition. The claimant appealed from the referee's order and was sustained by the board. So the defendant filed a petition, in December, 1922, to terminate the compensation agreement, on the ground that the claimant's disability had terminated. The defendant averred that the claimant could do light work since Aug. 5, 1921, but had never made any effort to demonstrate his earning power and had not reported to the company for trying such work, as advised by the surgeons who gave him treatments. The claimant made answer to the petition from the National Soldiers' Home in Virginia on Dec. 20, 1922, denying the averments in the defendant's petition and saying that he was totally disabled as a result of the accident and had been ever since it happened, and that he had been dependent on charity since receiving his last compensation on May 31, 1921; that he was confined to the almshouse, where he was cared for by the American Legion and Red Cross, and was then, Dec. 20, 1922, at the said National Soldiers' Home. The referee dismissed the petition Feb. 2, 1923. His action was sustained by the board and later by this court. See 20 Schuyl. Legal Rec. 108. Then the defendant filed a petition, dated Dec. 10, 1923, to terminate the compensation agreement, saying that the disability had terminated; that the employee was able to do light work not later than July 25, 1922, but had never made any effort to determine his earning power. Claimant answered and denied that he could do light work, and averred that he was totally disabled since the accident, saying that he had been an inmate of the National Soldiers' Home in Virginia since December, 1922. Referee Seidel disposed of the case, *inter*

*alia*, saying: "(2) We find that this claimant was totally disabled until the date of this hearing, which is Feb. 28, 1924. . . . (3) On the day of the last hearing, which was as above mentioned, Feb. 28, 1924, he was examined by Doctors J. Monahan and J. B. Rogers on behalf of the defendant company. After the examination, they testified at the hearing that the claimant could do some character of light work. We agree with them and find that, on and after Feb. 28, 1924, claimant was able to do work of a light character." He dismissed the petition for the termination of the agreement, but ordered compensation payments to be made up to Feb. 28, 1924, and suspended them thereafter until such time as claimant would demonstrate his earning power. Dec. 8, 1924, Sincavage petitioned the board to reinstate the agreement which was suspended on Feb. 28, 1924, saying: "I attempted to work, securing employment at Maple Hill Colliery, but was unable to continue, owing to my physical condition. I am still totally disabled as a result of the accident. I am unable to do any work; I have no earning power; my physicians have advised that I be examined by a neurologist. I have no funds to pay for such examination; I believe that injustice will be done with my case if I do not have such examination. I request the appointment of an impartial neurologist to examine me." The defendant denied the averments and said that the claimant worked for defendant at Maple Hill Colliery from Nov. 20th to Nov. 26, 1924, and quit without giving any reason; that he did his work satisfactorily and was physically able to do it. Referee Seidel disposed of the case Aug. 8, 1925. Among the witnesses before him was an impartial witness, Dr. T. H. Weisenberg, a neurologist, who had examined the claimant and then sent him to the Orthopedic Hospital in Philadelphia, where a more thorough examination could be had. The claimant remained at the hospital four days and a thorough examination of him was made there. The referee, *inter alia*, found: "(4) Dr. Weisenberg is of the opinion that the claimant can and should do some work. That if the claimant could be brought to feel that he would get no more compensation, it would have a tendency to cause him to go to work. (5) The claimant did secure a job at Maple Hill Colliery of the defendant company and worked from Nov. 20th to Nov. 26, 1924, when he quit without notifying any one at the colliery. The work that he was doing was scrapping and cleaning the gangway; shoveling and digging loose stuff in the ditch and throwing it to the high side in the gangway. He could take his time at this work. Was permitted to do so by the defendant company. His weekly wage rate for this work would be $32.70. (6) We agree with Dr. Weisenberg that the claimant can do some character of work. We believe that he can do the work that he was doing from Nov. 20th to Nov. 26, 1924, or work of a kindred character. (7) He was a miner when injured. His weekly wage rate was $25.60 at the time." So the referee dismissed the petition on Aug. 8, 1925, and the claimant appealed Aug. 15, 1925, to the Workmen's Compensation Board, alleging that the findings of fact, four, five and six, are not supported by the evidence. On Dec. 21, 1925, the board affirmed the referee's action, and a petition by the claimant for a reargument, filed on Dec. 28, 1925, was dismissed by the board Aug. 10, 1926.

On Oct. 12, 1926, Sincavage, the claimant, again petitioned for a reinstatement of the compensation agreement which had been suspended Feb. 28, 1924, averring: "I have attempted to work, but am unable to work. I am still totally disabled, due to my injury. I got light work at the Pottsville Stove Works on Sept. 8, 1926, but was unable to do the work and only worked two and one-half days. I am dependent on charity and confined to the Schuylkill County Almshouse since July 8, 1925, and am still there." Defendant

answered Oct. 26, 1926, denying the averments in the claimant's petition and saying that Sincavage had had unusually fair consideration of his case, that the interests of justice had been fully served and further repetition should be discouraged, and that the claimant's trouble is likely to persist as long as he can hope to gain something by it.

The referee dismissed the claimant's petition on June 10, 1927, and he appealed to the board on June 14, 1927, on the ground that the findings of fact are not supported by the evidence and that the referee, therefore, erred in his conclusion. The board reversed the referee on Sept. 26, 1927, and reinstated the compensation agreement as of Dec. 8, 1924. So we now have before us the defendant's appeal from that decision. Defendant claims that certain findings of the compensation board are not sustained by competent evidence. Among them are these: (a) Dr. Weisenberg testified unequivocally that the neurasthenic condition of the claimant is due to his injury; (b) "Neurasthenia is recognized by the medical profession as a disease and there is testimony in this case that the neurasthenia was definitely caused by the accident and that the man's inability to will to do work is caused by the neurasthenia," and (c) "In this case the evidence is definite and the claimant is entitled to an award," etc.

The conclusion of the board must rest upon the testimony of Dr. Weisenberg, who has been engaged in mental and nervous diseases for the last twenty-five years and is Professor of Nervous Diseases in the Medical School of the University of Pennsylvania. He has examined the claimant several times, the last time being on March 30, 1927. He read over the testimony of the claimant and of others. He does not find the slightest difference whatever in his examination of the claimant; it is "just the same as two years ago." In the doctor's testimony we find the following: "I came to the conclusion that physically he is able to work. I find there is nothing wrong, so far as I could find from my examination that he couldn't work, because the power in his limbs is normal; that he could have done everything as before, excepting some stiffness in his back and feet, and his right leg is shorter than his left leg. Mentally, I find he is worse than two years ago. Here is a man who in a period of eight years did practically seven and one-half days' work, who is confirmed in his belief that he cannot work and confirmed in his belief that he can never get well. When I examined him two years ago, he thought he might get well; now he feels he will not get well. Now, while I don't see any difference physically, I think, so far as his mental status is concerned, he is now more than ever confirmed that he can't work. . . . I believe if this man's case was finally disposed of so he would know he couldn't reopen his case, he would be given something final, some final settlement, he would return to work. . . . There is another complication, and that is the fact he is a veteran, and this man doesn't differ at all from the hundreds of cases I have seen in the Veterans' Bureau. I mean, once those men get in the hands of the Veterans' Bureau, they keep on being hospital cases over and over again and will not work, and the Government has the same thing to do as you in this compensation case. This man, even though you were to settle his case, would still be a Veterans' Bureau case. Q. I understand your last qualified statement, assuming his case was finally disposed of from a compensation standpoint of this State's law, yet there would still be that mental belief there would be something coming to him from the Government? A. Yes, as he does not differ from the thousands of other cases in this country. Q. You would regard him as a neurasthenic? A. Yes, sir. . . . Q. Your opinion is substantially the same as you expressed when you testified in this case before?

A. Yes; if I may refer to that opinion, my. former hearing, I said that as long as the case continued, just as long as he will continue to reopen the case and try to get more compensation. On pages seven, eight and nine. That is exactly what he has done. He is running true to form. That is what all these people do. Q. So far as he is concerned, there is no doubt about it; the fact is he can work; that is, he can physically, but doesn't have the mental co-ordination? A. I would agree with the first part, but not with that he didn't have the mental co-ordination. I agree that he can't work and that the injury is responsible for producing such a mental phenomena. I believe that if this were finally disposed of, he would go back to work because he would have to. In that it would be rendering him service. He is now three years older. Had his case been disposed of two years after the accident, but as long as this thing continues, the more likelihood of making him permanently dependent on charity. I believe this man thinks he is entitled to compensation; that is evident, because he is constantly asking for a reopening of his case; that is the element which makes him feel he doesn't have to. He knows he can open this case, and he knows there is always a possibility that he might get some money. If that possibility were removed, he would then be faced with one of two alternatives, to one of the poorhouses or to one of the veterans' homes, or go to work, and the probabilities are, barring the eight years of enforced idleness having made a permanent idler out of him, that he would go to work, and I believe as long as he knows the case can be opened, the greater the probability that he will never work. In that respect I might say the man doesn't differ a particle from the scores of veterans I have seen, men who didn't get to France and men who probably didn't have a thing the matter with them in service, and after their discharge they worked a week or two and then went back to the Veterans' Hospital—admitted and discharged, admitted and discharged, and if not admitted they appeal to a congressman for admittance. It is a deplorable condition. Q. As far as Sincavage is concerned, this, as a matter of fact, is a real condition? A. Yes, sir. Q. It is a condition which plays upon his mind? A. Yes, sir. Q. It does naturally disable him, although he has the physical power to perform labor? A. Yes. Q. You did say before, and I think you still say, this man is not a malingerer? A. I do not think he is a malingerer. I believe he feels the pains he has and the inability to work are all true. He is not a faker. Q. Sort of an illusion? A. Not an illusion, but a false idea, which is based upon the fact that he does not have to work; that he can always get compensation; that perhaps the company owes him something for the severe injury he had. Q. This case has dragged out because he has the hope of something coming to him? A. Yes."

The evidence clearly supports the findings of the board. The board received no new evidence. It simply took the evidence produced before the referee and came to a conclusion contrary to that of the referee, as it may do under section 423 of the Act of June 26, 1919, P. L. 642, 664, which, *inter alia*, provides that: "In any such appeal, the board may disregard the findings of fact of the referee and may examine the testimony taken before such referee, and, if it deem proper, may hear other evidence, and may substitute for the findings of the referee such findings of fact as the evidence taken before the referee and the board, as hereinbefore provided, may, in the judgment of the board, require, and may make such disallowance or award of compensation or other order as the facts so found by it may require." See Vonot *v.* Hudson Coal Co., 285 Pa. 385.

The board has found that the claimant's condition is a disease which results naturally from the accident and makes his case compensable. As the findings

are supported by competent evidence, we may not disturb either them or the order reinstating the compensation agreement.

We have no case similar to this in this State, otherwise we should not have gone so fully into the history and the testimony respecting this claim. But the case of Lupfer *v.* Baldwin Locomotive Works, 269 Pa. 275, is somewhat analogous to this and is supportive of the conclusion arrived at by the Workmen's Compensation Board in this case, even though the petition for reinstatement of the agreement was presented years after the accident happened: Stinger *v.* Rinold Brothers et al., 80 Pa. Superior Ct. 420.

And now, Jan. 30, 1928, the exceptions are dismissed and the order reinstating the compensation agreement is affirmed.

From M. M. Burke, Shenandoah, Pa.